**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| IVY DONALDSON | |
|---|---|
| v. | CIVIL ACTION |
| SEPTA | NO. 17-4475 |

Baylson, J.                                                February 20, 2019

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Ivy Donaldson, a ten-year veteran of Defendant SEPTA's force of bus operators, lost control of her bus while on duty in May of 2015, causing her to fall from her driver's seat, injuring two passengers, and damaging her bus, which jumped a median and came to rest across grade-level railroad tracks in front of an operating freight train. Plaintiff asserts that her ensuing employment termination resulted not from the accident, but from sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). This Court must now determine whether genuine disputes of material fact preclude summary judgment for SEPTA on Plaintiff's claims. For the reasons discussed below, summary judgment for SEPTA is GRANTED IN PART and DENIED IN PART.

## I. UNDISPUTED FACTS

Defendant, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), hired Plaintiff Ivy Donaldson in 2005 to work as a bus operator in SEPTA's Southern District. See Def.'s Statement of Undisputed Material Facts (ECF 16-4, "SUMF") ¶ 1. Over the course of her employment, Plaintiff took several training courses, which included both classroom study and "on the road" training. Id. ¶ 2. Like all SEPTA bus operators, Plaintiff was required to follow certain rules—the Authority Standard Rules ("ASR") and the Bus Division Rules ("BDR")—which pertain to operator conduct, duties, performance, and safety. Id. ¶ 3.

1

During her employment, Plaintiff was a member of the Transport Workers' Union Local 234, which had a Collective Bargaining Agreement with SEPTA. Id. ¶ 5. That Agreement contains a policy for "progressive discipline," where discipline is imposed on SEPTA employees according to a progressive scale, beginning with a verbal warning, then a written warning, a one-day suspension, three-day suspension, and finally discharge. Id. ¶ 9. The policy allows SEPTA to bypass the progressive scale "for serious safety violations other than signal violations." Id. ¶ 10.

The Collective Bargaining Agreement also provides for a four-step disciplinary and grievance procedure for members of the union. Id. ¶ 6. First, the employee must be made aware of the charges against her at an Informal Hearing. Id. At the Informal Hearing, the Assistant Director or the Director at the employee's assigned location recommends specific discipline. Id. The employee may then grieve the recommended discipline through union representation. Id. The second step of the process involves a Formal Hearing, where a more senior supervisor hears evidence and imposes discipline. Id. ¶ 7. That decision may then be appealed to the third step of the process—a hearing before a SEPTA Labor Relations Manager. Id. If the grievance is denied at the Formal Hearing and the Labor Relations Hearing, the union can elect to arbitrate the grievance, which is the fourth and final step in the disciplinary process. Id. ¶ 8.

### A. Previous Incidents

On July 9, 2014, Richard Duckett, Director of the Southern District, observed Plaintiff double-park her personal vehicle in front of the Southern District, where she reported to the Dispatcher and then left the premises to move her personal vehicle. Id. ¶ 11. Assistant Director Tom Ropars investigated the conduct and determined that Plaintiff violated two rules—ASR-5, which prohibits an employee from leaving her place of duty without being relieved or otherwise given permission, and BDR-1, which requires operators to report to the Dispatcher's Office either

2

prior to or at their scheduled report time. Id. ¶¶ 12–14. On July 24, 2014, Ropars recommended

that Plaintiff receive a one-day suspension for these violations. Id. ¶ 14.

On April 11, 2015, Duckett again observed Plaintiff double-park her personal vehicle, enter

the premises, and then return to her vehicle. Id. ¶¶ 15–16. Duckett confronted Plaintiff on that

date, although the circumstances of the confrontation are disputed by the parties. Id. ¶ 16; see also

Pl.s' Resp. to SUMF (ECF 19-2) ¶ 16.[1] In response to this second incident, Ropars recommended

that Plaintiff receive a three-day suspension for again violating ASR-5 and BDR-1. SUMF ¶ 17.

Plaintiff's union then grieved the three-day suspension. Id. ¶ 18.[2] The grievance was initially

denied at a Formal Hearing by SEPTA Senior Director Thomas Marcucci, but on appeal, Labor

Relations Manager Michael Feinberg sustained the grievance and the three-day suspension was

rescinded. SUMF ¶ 19.

Plaintiff filed a complaint with SEPTA's Equal Employment Opportunity/Affirmative

Action/Employee Relations Department ("EEO Department") on April 14, 2015. Id. ¶ 20. In her

complaint, Plaintiff alleged, among other things, that during the April 11, 2015 incident, Duckett

followed her to her personal vehicle in a harassing manner. Id. ¶ 21. Tom Comber, Manager of

---

[1] Material to Plaintiff's position is the allegation that Duckett placed his hands on Plaintiff's shoulders and physically turned her around to address her. SUMF ¶ 16 n.1; see also Pl.'s Statement of Disputed Material Facts (ECF 19-1, "Pl.'s SOF") ¶¶ 14, 19. Although Plaintiff contends that she submitted an incident report about the physical contact and reported it to her union representative, SEPTA maintains that it has no record of such a report. Pl.'s SOF ¶ 20; Def.'s Resp. to Pl.'s SOF (ECF 22-1) ¶ 20.

[2] There is some discrepancy over the level of Plaintiff's involvement in the union proceedings described throughout this section. Defendant alleges that Plaintiff grieved the three-day suspension through her union. SUMF ¶ 18. However, Plaintiff contends that the union commences grievance proceedings, which occur solely between the union and SEPTA, and that the grievant—in this case, Plaintiff—is unrepresented by her own counsel and unable to question witnesses or present additional evidence. Resp. to SUMF ¶¶ 7, 18, 19, 51.

Employee Relations, ultimately determined that Plaintiff's complaint did not meet the requirements for discriminatory harassment. Id. ¶ 23.

Plaintiff's Complaint in this matter likewise alleges that Duckett subjected her to sexual harassment. Id. ¶¶ 24–28. Although not included in detail in the complaint she filed with the EEO Department, Plaintiff testified at her deposition that Duckett sometimes commented on her appearance by instructing her to tuck in her shirt or complimenting her shoes. Pl.'s SOF ¶ 7.[3] She further testified that Duckett made her uncomfortable by asking to speak with her alone in his office, by "flirting" with her and other female bus operators, and by staring at her. Pl.'s SOF ¶¶ 9–10.[4] Plaintiff even learned through conversations with other operators that Duckett had been inquiring about who Plaintiff was having sex with. Pl.'s SOF ¶ 9.[5] Plaintiff twice sought transfer from the Southern District to work on the "El" train. Pl.'s SOF ¶¶ 22–23. Plaintiff never learned the outcome of her first transfer request, and the second request was denied due to a shortage of personnel. Id. ¶ 23.[6]

---

[3] SEPTA contests Plaintiff's characterization of Duckett's behavior as "sexual." See Def.'s Resp. to Pl.'s SOF ¶ 7. Rather, SEPTA explains that it has a policy requiring bus operators to tuck in their shirts and wear shoes with a heel. Id. To the extent Duckett complimented Plaintiff's choice of shoes, SEPTA points out that Plaintiff testified she was not "offended" by it. Id.

[4] SEPTA contests Plaintiff's presentation of these facts by highlighting that Plaintiff did not put forth sufficient evidence of what constituted "flirting," and could not identify any other bus operators who Duckett allegedly "flirted" with. Resp. to Pl.'s SOF ¶ 9. Where Plaintiff claims that "Duckett would stare at [her] up and down in a sexual manner," Pl.'s SOF ¶ 10, SEPTA notes that the record only supports the fact that, on two occasions, Plaintiff "observed Duckett with his hands folded staring out of the window of his office at her while she was outside . . . and that it made her uncomfortable." Resp. to Pl.'s SOF ¶ 10.

[5] Again, SEPTA contests the factual basis on which Plaintiff makes this claim, as Plaintiff "has no personal knowledge of conversations [Duckett] had with other operators." Def.'s Resp. to Pl.'s SOF ¶ 9.

[6] Plaintiff implies that Duckett had a duty to notify her of the outcome of her first transfer request, which SEPTA denies. Pl.'s SOF ¶ 22; Def.'s Resp. to Pl.'s SOF ¶ 22. Plaintiff further complains that while her second request was denied for lack of personnel, six other operators were released from the Southern District to be transferred. Pl.'s SOF ¶ 23.

### B.    The May 5, 2015 Accident

On May 5, 2015, Plaintiff was assigned to work the Route 29 bus, which involved turning left onto Tasker Street and then crossing over Columbus Boulevard in the southeast portion of Philadelphia.  SUMF ¶ 29.  That section of Columbus Boulevard has railroad tracks that run through the middle of the roadway, separating the northbound and southbound lanes.  Id. ¶ 30.  At some point during her shift, Plaintiff parked her bus at a shopping plaza and failed to "chock" or secure the wheels before exiting to take her break.  Id. ¶ 31.[7]  When Plaintiff returned to the bus, she placed newspapers on the driver's seat and failed to secure her seat belt before commencing, or during the operation of, her assigned bus route.  SUMF ¶¶ 32–33.

While driving her assigned route, Plaintiff failed to stop at a stop sign before turning left on Tasker Street.  Id. ¶ 35.  Tasker Street is a two-way street that intersects and crosses over Columbus Boulevard.  Id. ¶ 36.  As Plaintiff approached Columbus Boulevard, a freight train blocked the intersection, preventing her from crossing over on Tasker Street.  Id. ¶ 37; Resp. to SUMF ¶ 37.  Plaintiff observed several vehicles—including a SEPTA bus with its hazard lights on—stopped ahead of her in her lane of travel.  SUMF ¶¶ 38–39; Resp. to SUMF ¶ 39.  Plaintiff drove her bus into the opposing lane of traffic on Tasker Street to pass the stationary vehicles, and then turned right onto Columbus Boulevard.  SUMF ¶ 40; Resp. to SUMF ¶ 40.  Because a Route 29 bus would ordinarily drive straight across Columbus Boulevard on Tasker Street, which Plaintiff could not do because of the freight train, this right-turn onto Columbus Boulevard was a deviation from Plaintiff's scheduled route.  SUMF ¶ 41.[8]

---

[7]    Plaintiff contends that her bus did not have a "chock," thus preventing her from securing the vehicle before exiting as SEPTA suggests she should have done.  See Resp. to SUMF ¶ 31.

[8]    The parties agree that Plaintiff failed to contact SEPTA's Control Center before deviating from her route, however disagree about whether Plaintiff was actually required to give notice of or seek approval for such a deviation.  SUMF ¶ 41; Resp. to SUMF ¶ 41.

Plaintiff then drove on Columbus Boulevard to the intersection at Dickinson Street, where she executed a U-turn from the center lane of traffic. SUMF ¶ 42; Resp. to SUMF ¶ 42. This U-turn required Plaintiff to cross over the railroad tracks in front of the freight train. SUMF ¶ 42.[9] In the course of turning the bus, Plaintiff fell out of her seat and the bus went over a curb, becoming disabled on the railroad tracks in front of the freight train. SUMF ¶¶ 44–45.[10] In addition to Plaintiff falling to the floor, two passengers were thrown from their seats during the accident, and the bus sustained damage. SUMF ¶¶ 46–47.

### C. Investigation and Discharge Decision

Following the May 5th accident, Duckett called Plaintiff at her home on numerous occasions while Plaintiff was on "injured-on-duty leave." Pl.'s SOF ¶ 12.[11] Plaintiff was eventually placed on "light duty" at Frankford Transportation Center, where Duckett called on more than one occasion to speak with Plaintiff. Pl.'s SOF ¶ 13.[12] On May 27, 2015, Duckett conducted the Informal Hearing related to the accident. SUMF ¶ 48.[13] Duckett charged Plaintiff with the following rules violations:

---

[9] The parties disagree about whether Plaintiff observed whether the freight train had started moving again before attempting the U-turn in front of it. SUMF ¶ 43; Resp. to SUMF ¶ 43.

[10] SEPTA explains that Plaintiff lost control of the bus, but Plaintiff contends that the steering wheel was faulty, which caused the bus to climb the curb onto the tracks. SUMF ¶ 45; Resp. to SUMF ¶¶ 44–45. Plaintiff further contends that she complained of a faulty steering wheel from the time of the accident, but SEPTA never investigated her claim. Resp. to SUMF ¶ 44.

[11] Plaintiff characterizes this string of phone calls as harassment, Pl.'s SOF ¶ 12, whereas SEPTA explains Duckett was calling to have Plaintiff complete paperwork. Def.'s Res. to Pl.'s SOF ¶ 12.

[12] The parties again disagree about the nature of these calls. Plaintiff contends that Duckett called asking about her whereabouts and shift changes, constituting harassment. Pl.'s SOF ¶ 13. Defendant concedes that Duckett called to speak with Plaintiff at Frankford Transportation Center, but argues there is no evidence in the record to conclude the calls were "harassing." Def.'s Resp. to Pl.'s SOF ¶ 13.

[13] Plaintiff explains she was still on "injured-on-duty" status at the time of the hearing. Resp. to SUMF ¶ 48. It is unclear how that status may have affected the hearing or its outcome.

| | |
|---|---|
| BDR -154 | Securing the Vehicle – providing, in relevant part, that operators must "chock" the wheels of the bus. |
| ASR-8 | Personal Appearance – "Shirttails must be tucked into pants." |
| ASR-18 | Use of Seat Belts – "Employees are requires to wear seat belts, in vehicles so equipped, while operating Authority vehicles." |
| BDR-51.2– 51.3 | Vehicle Operating Responsibilities – "Vehicle operators are responsible for the following . . . 2. the observance of all operating signals, signs, traffic control devices, and for controlling vehicle movement accordingly. 3. Regulating the speed of the vehicle by applying defensive driving techniques to prevent injury to persons or damage to property, and to prevent damage and collision." |
| BDR-153.D | Unauthorized Use of Authority Vehicles – "The following are examples of such misuse in which no operator/employee may engage without specific prior approval of a responsible supervisor: . . . Deviating from scheduled routings . . ." |
| ASR-11 | Reporting Unusual Conditions – "The following unusual conditions must be reported to the Train Dispatcher/Controller or other appropriate supervisor immediately by the quickest means of communication . . . f. Obstructions to [t]racks, road closures and detours. . . ." |
| BDR-205 | Operation at Railroad Crossings – generally requiring operators to stop at all railroad crossings, activate the bus hazard lights, open to listen and look for approaching trains and not proceed until it is ascertained that there are not trains approaching. |
| BDR-201 | Conditions That Require Movement at a Slower Speed. |
| ASR-1 | Safety Requirement – "safety is the first priority in the performance of duty. In case of doubt, the safe course must be taken." |
| BDR-203 | Reckless Driving – "operating of any vehicle carelessly and/or willfully or wantonly disregarding the rights or safety of others or in a manner so as to endanger any person or property is considered reckless driving." |
| ASR-7 | Personal Conduct – "employees are expected at all times to conduct themselves in a manner which does not jeopardize or otherwise disgrace the public image of the Authority." |

SUMF ¶ 49. Duckett recommended that SEPTA terminate Plaintiff's employment because of the

accident. Id. ¶ 50. Plaintiff's union then grieved the proposed discharge. SUMF ¶ 51; Resp. to

SUMF ¶ 51.[14]  A Formal Hearing was conducted on July 22, 2015 by SEPTA Senior Director

Thomas Marcucci.  SUMF ¶ 51.  After reviewing the evidence, including the bus surveillance

video taken during Plaintiff's accident, Marcucci denied the grievance and upheld the discharge.

Id. ¶ 52.  The decision was appealed to a Labor Relations Hearing, where it was upheld by Labor

Relations Manager Joseph Horbury, and then to arbitration, where the discharge decision was

again upheld.  Id. ¶¶ 53–56.

### D.    Plaintiff's Comparators

In opposing the termination of her employment as unlawfully discriminatory and

retaliatory, Plaintiff highlights SEPTA's treatment of the following male bus operators who

engaged in conduct Plaintiff deems similar to her own.

Danny Vaughan is a male, former SEPTA bus operator assigned to SEPTA's Comly

District.  Id. ¶ 57.  On December 27, 2011, Vaughan was operating a SEPTA bus when, during a

turn, he struck a pedestrian who was crossing the street.  Id.¶ 58.  The assistant director of his

district recommended that Vaughan be discharged, but the discharge was reduced to a one-day

administrative suspension during a Formal Hearing.  Id. ¶¶ 59–60.

Robert Perna is a male, bus operator assigned to SEPTA's Callowhill District.  Id. ¶ 61.  In

July, 2014, Perna's bus made contact with a pedestrian.  Id. ¶¶ 62–63; Resp. to SUMF ¶¶ 62–63.

The director of his district recommended that Perna be discharged, but the discharge was reduced

to a written warning by Marcucci following Union grievance procedures.  SUMF ¶¶ 64–65; Pl.'s

SOF ¶ 124.  Perna was involved in a second incident where his bus made contact[15] with a

---

[14]     See supra note 1 for a discussion of the parties' disagreement over whether Plaintiff or the
union itself grieved her proposed discharge.
[15]     The parties disagree about how to characterize Perna's accidents.  SEPTA contends that in
both accidents, the pedestrians walked into Perna's bus.  See SUMF ¶¶ 62, 66.  But Plaintiff argues
that Perna's bus struck the pedestrians.  Resp. to SUMF ¶¶ 62, 66.

pedestrian in November, 2014, but was not disciplined as a result of the accident. SUMF ¶¶ 66–67.

Steve Coia is a male bus operator assigned to SEPTA's Comly District. Id. ¶ 68. While Coia was relocating his bus at Frankford terminal, a pedestrian fell under his wheel and was run over. Id. ¶ 69.[16] SEPTA conducted an investigation of some kind and decided to classify the incident as "preventable," resulting in no discipline to Coia. SUMF ¶ 71; Resp. to SUMF ¶ 71.

Dominic Parenti is a male bus operator assigned to SEPTA's Comly District. SUMF ¶ 73. In January, 2015, Parenti's bus struck a pedestrian. Id. ¶ 74. The director of his district conducted an informal hearing and proposed that Parenti receive a one-day suspension for the incident. Id. ¶¶ 75–76. Parenti accepted the suspension and no grievance proceedings followed. Id. ¶ 76.

Elliott Lopez is a male, former bus operator assigned to SEPTA's Southern District. Id. ¶ 77. In May, 2014, Lopez made an illegal U-turn along his assigned route, and his director—Duckett—recommended that he receive a three-day suspension. Id. ¶ 77.[17] Unlike in Plaintiff's case, Duckett did not obtain the bus's internal video recording for the time of the incident. Pl.'s SOF ¶ 108.[18]

Stephen Green is a male bus operator assigned to SEPTA's Southern District. SUMF ¶ 78. On April 5, 2013, Green's bus rear-ended another SEPTA bus—coincidentally operated by

---

[16]    Again, the parties disagree about the exact nature of this accident. SEPTA says that Coia was finished his run and simply moving the bus at less that five-miles-per-hour when, unbeknownst to Coia, a pedestrian fell under his rear wheel. SUMF ¶¶ 69–70. Plaintiff explains that Coia was conversing with the pedestrian through an unopened front door, which resulted in the pedestrian falling under the bus, causing his death. Resp. to SUMF ¶ 69.

[17]    Plaintiff lists numerous other incidents in his Statement of Facts involving a bus driven by Lopez—only the incidents that occurred while Duckett was Lopez's supervisor are included here.

[18]    Plaintiff seems to reference other safety violations involving Lopez, and the different levels of discipline that were recommended, but it is unclear what exactly took place to prompt the discipline, and it is also unclear when the violations took place.

Plaintiff—causing damage to Green's bus. Id. ¶ 79. The director assigned to the district at that time recommended that Green receive a written warning. Id. On November 1, 2013, Green was involved in another accident where a portion of the bus he was operating struck another vehicle. Id. ¶ 80. The director assigned to the district at that time recommended a one-day suspension. Id. On October 4, 2016, Green was involved in yet another accident where a portion of his bus made contact with a back hoe while Green was driving through a work zone. Id. ¶ 81. His director at the time—Duckett—recommended a written warning and one-day suspension. Id. On another occasion, Duckett recommended that Green receive a written warning in connection with a red light camera violation. Pl.'s SOF ¶ 96.

Shaheed Westmoreland is a bus operator assigned to SEPTA's Southern District. SUMF ¶ 82. In 2015, the bus Westmoreland was operating made contact with the side mirror of a parked car. Id. ¶ 83. At a later date, Westmoreland's bus made contact with the door of a car. Id. ¶ 84. Then, at a later date, Westmoreland's bus made contact with a pole, causing the bus's side mirror to fall off. Id. ¶ 85.[19] In at least one accident that occurred on January 11, 2016, Duckett recommended Westmoreland receive a written warning after his bus hit a portion of a parked car. Pl.'s SOF ¶ 90.

Dorian Thompson is a now-retired bus operator who was assigned to SEPTA's Southern District. SUMF ¶ 86. On April 4, 2014, Thompson's bus was struck by another vehicle, causing Thompson to lose control of the bus and hit several parked cars. Id. ¶ 87. Thompson fell from his

---

[19]     Plaintiff explains that Westmoreland was not terminated as a result of any of these accidents. Resp. to SUMF ¶¶ 83–85. Plaintiff also contends that Westmoreland was once in an accident after circumventing a train and crashing into another vehicle, for which he was not discharged. Pl.'s SOF ¶ 85. Plaintiff provides no dates or names of decisionmakers related to this accident, and presents no evidence of this accident other than her own testimony. Id.; Def.'s Resp. to Pl.'s SOF ¶ 85.

seat and lost consciousness,[20] the bus he was operating sustained damage, and several passengers suffered injuries. SUMF ¶ 87. Thompson received a written warning from Duckett and Ropars as a result of the accident. Id. ¶¶ 87–88; Pl's Resp. to SUMF ¶ 88.

Thomas D'Achino is a male bus operator assigned to SEPTA's Southern District. Pl.'s SOF ¶ 138. D'Achino's bus made contact with a ladder as a roofer was taking the ladder off of a truck and Duckett and Marcucci issued no discipline. Pl.'s SOF ¶ 140.

## II.    PROCEDURAL BACKGROUND

Plaintiff commenced this civil action on October 10, 2017. (ECF 1). Her Complaint asserts the following claims:

Count I:        Title VII Violations—Sex Discrimination

Count II:       PHRA Violations—Sex Discrimination

Count III:      Title VII Violations—Retaliation

Count IV:       PHRA Violations—Retaliation

SEPTA then filed this Motion for Summary Judgment on August 30, 2018. (ECF 16, "Mot." or "Motion"). Plaintiff responded in opposition on October 1, 2018 (ECF 16, "Opp'n" or "Opposition"), and SEPTA replied in support on October 18, 2018 (ECF 22, "Reply"). The Court then held oral argument on February 14, 2019.

## III.    LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a

---

[20]      Plaintiff contends Thompson lost control and fell from his seat because he was not wearing a seatbelt. Resp. to SUMF ¶ 87.

reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u>

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as to the material facts"). Summary judgment is appropriate if the adverse party fails to rebut the motion by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson</u>, 477 U.S. at 255.

## IV.     DISCUSSION

### A.     Sex Discrimination Under Title VII and the PHRA (Counts I and II)

Counts I and III allege discrimination under Title VII and the PHRA, respectively. Although not separated out in her Complaint, it appears that Plaintiff has alleged two different types of sex-based discrimination—hostile work environment and disparate treatment.

Discrimination claims brought under Title VII and the PHRA, including those based on sex, which rely on circumstantial evidence are controlled by the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).  See Atkinson v. LaFayette Coll., 460 F.3d 447, 454 & n.7 (3d Cir. 2006) (applying the McDonnell Douglas framework to a Title VII sex discrimination claim); Mandel v. M&Q Packaging Corp., 706 F.3d 157, 163 (3d Cir. 2013) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").  *First*, a plaintiff must establish a *prima facie* case of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802.  *Second*, if the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the treatment.  Id. at 802–03. *Third*, if the defendant successfully puts forth such a reason, the burden shifts back to the plaintiff to prove that the defendant's explanation is merely a pretext for the employment discrimination. Id. at 804–05.

### 1.    Hostile Work Environment

Plaintiff's claim for sex discrimination is premised, in part, on a theory of hostile work environment.  To establish a *prima facie* claim for hostile work environment under Title VII and the PHRA,[21] a plaintiff must show evidence that:  (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of her sex in that position; and (5) the existence of *respondeat superior* liability exists.  Huston v. Proctor & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).  While "[a]n unpleasant work environment is not a good thing, . . . . Title VII is violated only 'when the workplace is

---

[21]    The Court will analyze Plaintiff's claims under Title VII and the PHRA interchangeably. See Burgess v. Dollar Tree Stores, Inc., 642 F. App'x 152, 154 n.7 (3d Cir. 2016) (considering claims for hostile work environment under Title VII and the PHRA together).

permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to . . . create an abusive working environment.'" Burgess v. Dollar Tree Stores, Inc., 642 F. App'x 152, 155 (3d Cir. 2016) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). This Court must therefore "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998) (citations omitted). The "conduct must be extreme" to fall within the parameters of Title VII. Id. at 788.

SEPTA argues that Plaintiff has failed to proffer sufficient evidence for her hostile work environment claim because there are no facts in the record to suggest Duckett's conduct was related to Plaintiff's sex or that it was severe and pervasive. Mot. at 20. In response, Plaintiff argues that the record contains enough facts, albeit disputed facts, that she was subjected to sexual harassment and a hostile work environment by Duckett. Plaintiff highlights her efforts to transfer out of Duckett's department and Duckett's decision not to tell her that the transfer request was denied. She further contends that Duckett physically assaulted her as she walked to her double-parked vehicle outside the Southern District, that SEPTA failed to properly investigate and remediate the allegations in her EEO complaint, and that Duckett made a string of harassing phone calls to Plaintiff while she was on injured-on-duty leave. Opp'n at 14–15. Plaintiff testified at her deposition that Duckett did the following: commented on Plaintiff's clothing and shoes; spoke in an unprofessional tone and invited Plaintiff into private meetings in his office; flirted with Plaintiff

and other female bus operators; inquired about who Plaintiff was having sex with; and grabbed Plaintiff's shoulder as she walked to her car on April 11, 2015.[22]

At Oral Argument, Plaintiff's counsel reiterated that Plaintiff believed Duckett's comments and conduct directed towards her were overtly sexual. As evidence for her hostile work environment claim, Plaintiff's counsel cited: Duckett's observations on Plaintiff's clothing; his questions regarding who Plaintiff was having sex with; his staring at Plaintiff in a sexual manner; his physical contact with Plaintiff on April 11, 2015; and his persistent calls to her home after the May 5, 2015 accident, even when Plaintiff was on injured-on-duty leave and asked him to stop calling her. Plaintiff's counsel also noted that although Plaintiff filed an EEO complaint after Duckett grabbed her shoulder on April 11, 2015, SEPTA's EEO representative admitted that he did not follow-up at all with Plaintiff, and did not question Duckett about Plaintiff's specific, sexual-harassment related complaint.

SEPTA attempts to explain away much of this testimony, either by pointing to its dress code regulations requiring bus operators to tuck in shirts and wear heeled shoes, arguing that the testimony is unsupported by sufficient explanatory facts, or noting that the testimony is impermissible hearsay. According to SEPTA, the one incident of arguably harassing behavior— Duckett physically grabbing Plaintiff's shoulder—is not enough on its own to support a showing of severe and pervasive hostile work environment.

Taking the facts in Plaintiff's favor, the incidents she describes do not make out the type of severe workplace conduct Title VII seeks to proscribe. Plaintiff characterizes Duckett's comments on her clothing as "subliminal[ly] sexual," however nothing in the record supports such

---

[22]     Plaintiff also argues that the denial of her transfer requests is somehow evidence of harassment, but she never explains the role Duckett played, if any, in considering those requests.

a characterization. And Plaintiff herself acknowledged she was "not offended" by the compliment of her shoes. See Harris, 510 U.S. at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). Plaintiff's remaining evidence likewise cannot sustain a claim for hostile work environment. Allegations that Duckett was unprofessional and desiring to talk "off the record" are vague at best, and do not evidence a workplace "permeated with discriminatory intimidation, ridicule, and insult" that Title VII is meant to vitiate. Harris, 510 U.S. at 21; Taylor v. Cherry Hill Bd. of Educ., 85 F. App'x 836, 839 (3d Cir. 2004) ("[C]onclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment.").

Moreover, Plaintiff cannot rely on allegations that Duckett used graphic language with other female bus operators and asked others about Plaintiff's sexual activity, because those allegations derive entirely from inadmissible hearsay. "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995). This Court must therefore determine whether the hearsay statements a nonmovant relies on are admissible at trial, and the nonmovant "need only 'explain the admissible form that is anticipated'" to satisfy the inquiry. Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment). Where the nonmovant is unable to identify the person who relayed the information, the statement is not capable of being admissible at trial and cannot be considered on a motion for summary judgment. Id. (citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996)). Much of Plaintiff's testimony about how Duckett treated other female bus operators

derives from statements made by others, and about which Plaintiff has no first-hand knowledge. This is particularly true of Plaintiff's statement that she learned from other bus operators that Duckett had been inquiring about Plaintiff's sexual activity. When asked, Plaintiff was unable to identify the persons who shared this information.[23] The statements are therefore inadmissible hearsay, and Plaintiff cannot rely on them to overcome this motion for summary judgment.

Even considering Plaintiff's accusation that Duckett grabbed her shoulders on one occasion, the totality of Plaintiff's admissible, non-hearsay evidence does not establish the regular and pervasive sex-based discrimination that she must show to establish a *prima facie* case of hostile work environment. Summary judgment is therefore granted on Plaintiff's hostile work environment claim.

## 2. Disparate Treatment

### a. *Prima Facie* Case

Plaintiff also asserts a sex discrimination claim on a theory of disparate treatment. Where a Title VII and PHRA sex discrimination claim[24] is premised on a theory of disparate treatment, the plaintiff must demonstrate a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she was qualified for the position she sought to retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).

---

[23]    Plaintiff testified that she learned Duckett was inquiring about her sexual activity by "overhear[ing] conversations among the male operators," Donaldson Dep. at 143:22-23, and from another female operator, Keisha Lawrence. Id. at 144:13-22. Plaintiff was unable to identify the male operators she overheard, id. at 144:1-8, and testified that Lawrence learned the information because "someone told her." Id. at 145:1. Plaintiff did not know who shared the information with Lawrence. Id. at 145:1-6. For the above reasons, the Court cannot consider this hearsay testimony.

[24]    "The standard for proving sex discrimination by disparate treatment is identical under [Title VII and the PHRA]." Homel v. Centennial Sch. Dist., 836 F. Supp. 2d 304, 318 (E.D. Pa. 2011).

To satisfy the fourth element, the plaintiff may demonstrate that similarly-situated persons outside the protected class were treated more favorably. Collins v. Kimberly–Clark Pennsylvania, LLC, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017) (Jones, J.). Although the plaintiff's comparators need not be identically situated, they must be similar to plaintiff in "all relevant respects." Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222–23 (3d Cir. 2009). Where plaintiff alleges that fellow employees were similarly situated, she must show that the "employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. at 223. The plaintiff must further show that "the other employee's acts were of 'comparable seriousness.'" Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994).

The parties do not dispute that Plaintiff, a female, was a member of a protected class, nor do they dispute that she was qualified for the position of bus operator or that she suffered an adverse employment action—that is, termination of her employment. SEPTA argues that Plaintiff has not met her burden of showing a *prima facie* case because the record is devoid of evidence that similarly situated male employees were treated more favorably. Assuming, *arguendo*, that Plaintiff could meet her *prima facie* burden, SEPTA also contends that Plaintiff has not developed evidence of pretext, as required to meet the third prong of the McDonnell Douglas framework. In response, Plaintiff largely relies on the argument that she has put forth enough comparator evidence to survive summary judgment. Plaintiff also contends that a reasonable jury could find

that SEPTA failed to put forth a legitimate reason for termination or could conclude that SEPTA's reason was pretextual.

Plaintiff has put forth evidence relating to at least ten comparators—male bus operators who were involved in on-duty accidents but received discipline that was less severe than discharge. Taking the facts in favor of Plaintiff, many of those comparators were involved in serious, repeated accidents that caused property damage, injury, and death to at least one pedestrian. In the vast majority of those cases, however, the male bus operators were not subject to discipline by the same supervisor or supervisors as Plaintiff.

Plaintiff argues in her Opposition, and her counsel reiterated at Oral Argument, that comparators need not be subject to the same supervisor as Plaintiff to be considered "similarly situated." See Opp'n at 21. Plaintiff relies on Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346 (W.D. Pa. 2010), where Magistrate Judge Lenihan determined that the plaintiff's comparators were similarly situated to plaintiff even though they did not share the same direct supervisor. Id. at 364. Although only four of the eighteen proposed comparators shared plaintiff's immediate supervisor, all of their cases were reviewed by the same labor relations managers and the same human resources manager was involved in each determination of disciplinary action. Id. at 363–64.

Plaintiff likewise contends that SEPTA's Labor Relations Department reviewed "most of these disciplinary actions, but failed to make sure that Plaintiff was treated equally as these male co-workers." Opp'n at 23. Plaintiff presents no precedential case law, and the Court is aware of none, requiring us to consider the Labor Relations Department as Plaintiff's "supervisor" for this Title VII discrimination analysis. While the Court could possibly consider the Labor Relations Manager who oversaw Plaintiff's case—Joseph Horbury—as one of her supervisors or as one of the decisionmakers in her discharge, Plaintiff presents no evidence showing that Horbury presided over any of the purported comparators' cases.[25] Still, the Court is satisfied that the record shows Duckett, Ropars, and Marcucci all exerted influence over Plaintiff's discharge.[26] The Court will therefore only consider comparators that received discipline from these three decisionmakers.

Of the ten proposed comparators, only six male bus operators were subject to discipline by Duckett, Ropars, or Marcucci on at least one occasion: Shaheed Westmoreland, Stephen Green, Elliott Lopez, Thomas D'Achino, Dorian Thompson, and Robert Perna. Viewing the record most favorably for Plaintiff, the incidents that these bus operators engaged in, and the respective discipline each received, are as follows:

- Westmoreland's bus hit the mirror of a parked vehicle as it navigated a narrow road and Duckett recommended a written warning. Pl.'s SOF ¶ 90.

- Green's bus made contact with a back hoe while he was driving through a work zone, for which Duckett recommended a written warning and one-day suspension.

---

[25] It is unclear how the Court should weigh evidence of comparators' success during the grievance process, if at all. The parties have not put forth evidence of the various arguments made by the comparators' union during the grievance process, nor have they addressed the standards of review employed by SEPTA at each level of the four-step grievance process.

[26] In Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 367 (3d Cir. 2008), the Third Circuit held that a strict focus on an employees' direct supervisor was "irrelevant" where a separate, individual decisionmaker exerted control over all of the employment decisions at issue in that case.

SUMF ¶ 81. Green later drove his bus through a red traffic light and received a written warning from Duckett. Pl.'s SOF ¶ 96.

- Lopez made an illegal U-turn and Duckett recommended a three-day suspension; Ropars proposed "discharge with dignity" at some point, however it is unclear if this discipline was related to the same illegal U-turn. Pl.'s SOF ¶¶ 107, 116.

- D'Achino's bus made contact with a ladder as a roofer was taking the ladder off of a truck and Duckett and Marcucci issued no discipline. Pl.'s SOF ¶ 140.

- Thompson's bus was hit by a car that ran a red light, causing Thompson to lose control, fall from the driver's seat, and hit several parked cars. The accident occurred while Duckett was the Director assigned to the Southern District, and Thompson received a warning for the accident. SUMF ¶¶ 86–88.

- Perna's bus made contact with a pedestrian. SUMF ¶ 62; Pl.'s SOF ¶ 124. The parties disagree about whether Perna or the pedestrian was at fault. Although Perna's supervisor proposed discharge, Marcucci reduced the discipline to a written warning. Pl.'s SOF ¶ 124.

On these facts, Third Circuit precedent does not clearly warrant the Court granting summary judgment. Plaintiff has shown sufficient facts for a jury to determine whether these comparators were similarly situated to herself. Similarly, the conduct of these male bus operators varied in severity, from hitting cars and ladders in their periphery, to running red lights and making illegal U-turns, to injuring passengers and making contact with a pedestrian. SEPTA has valid arguments that none involved the string of misconduct Plaintiff was found to have engaged in— driving in opposing lanes of traffic; failing to notify a supervisor of her route deviation; attempting a U-turn across railroad tracks; failing to wear a seatbelt, thereby falling from her seat as her bus

came to rest in front of an operating freight train; and injuring passengers.  However, the Court will not rule on this as a matter of law in order to grant summary judgment for SEPTA.  A jury may conclude that these male employees did or did not engage in acts of comparable seriousness to Plaintiff's May 5, 2015 accident.  Plaintiff therefore has established her *prima facie* case of disparate treatment.

### b.    Pretext

SEPTA further explains that it had a legitimate, nondiscriminatory reason for discharging Plaintiff—that Plaintiff extensively violated SEPTA's rules and disregarded the well-being of her passengers on May 5, 2015.  SEPTA argues that Plaintiff has not developed any evidence to show that its legitimate reason for the discharge was pretextual.  In opposition, Plaintiff contends that she can show pretext through:  (1) SEPTA's failure to conduct a good-faith investigation into the accident; (2) SEPTA's decision to ignore mitigating evidence that Plaintiff's steering wheel was faulty at the time of the accident; and (3) showing the appropriate discipline for Plaintiff should be have been a three-day suspension—not discharge.  Plaintiff also points to her comparator evidence to further support her showing of pretext.

After showing a *prima facie* case, to survive a motion for summary judgment on the final two prongs of McDonnell Douglas, a plaintiff must "point to some direct or circumstantial evidence from which a factfinder could reasonably either (1) disbelieve [the defendant's] articulated reason, or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of [the defendant's] action."  Innella v. Lenape Valley Foundation, 152 F. Supp. 3d 445, 459 (E.D. Pa. 2015) (Baylson, J.).  The plaintiff can either: "(1) discredit [the defendant's] reason, by coming forward with such weaknesses, implausibilities, incoherencies, inconsistencies, or contradictions in the proffered reason to allow a rational

factfinder to find the reason unworthy of credence; or (2) adduce evidence that discrimination was more likely than not a motivating or determinative cause." Id.

Plaintiff argues at length about SEPTA's failure to fully investigate the May 5, 2015 accident and her claim that the steering wheel was faulty. Plaintiff produced a maintenance report performed on her bus the day after the accident. See Pl.'s Ex. P-28 (ECF 19-6). The report documents that a test was done to "[c]heck steering and suspension" and that a mechanic "[p]erformed visual inspection and test drove for steering and suspension defects, none found." Id. at 2. Plaintiff's counsel deposed that mechanic, Ronald Hebner.[27] See Pl.'s Ex. R. Hebner testified that he did not have an independent recollection of performing the inspection or of the specific tests he undertook to complete the inspection. Id. at 8:9-9:9.[28] The absence of independent recollection or knowledge does not create a genuine dispute in the face of documentary evidence Plaintiff herself presented that SEPTA inspected the bus and its steering by taking it on a road test one day after her accident. However, Plaintiff argues that SEPTA should have tested whether the bus was capable of a U-turn. This argument, combined with Plaintiff's comparator evidence and argument that she deserved a three-day suspension in SEPTA's progressive disciplinary system,

---

[27]     It is not clear from the face of the maintenance report, aside from notes entered with the initials "RXH," that Hebner performed the inspection. See Pl.'s Ex. P-28 at 2. Nor does Hebner's deposition transcript explicitly reference this maintenance report. See Pl.'s Ex. R (ECF 19-4). However, at Oral Argument both Plaintiff's and SEPTA's counsel referred to the maintenance report as having been completed by Hebner, and both referred to the "work order" referenced in Hebner's deposition as the maintenance report produced as Plaintiff's Exhibit P-28. The Court is therefore satisfied that there is no dispute over the fact that Hebner performed the inspection, and that the maintenance report produced as Plaintiff's Exhibit P-28 documents that inspection.

[28]     Plaintiff's counsel also deposed Jason Griffin, former Director of Maintenance at SEPTA's Southern Depot. Griffin likewise testified that he had no independent knowledge of what tests were performed on Plaintiff's bus after the May 5, 2015 accident. See Pl.'s Ex. F (ECF 19-3) at 12:2-4.

rather than discharge, could cause a jury to disbelieve SEPTA's articulated reason for the discharge. Plaintiff's arguments on pretext are thus best reserved for a jury at trial.

Summary judgment will be denied on Plaintiff's sex discrimination claim to the extent it is based on a theory of disparate treatment.

**B.      Retaliation Under Title VII and the PHRA (Counts III and IV)**

Counts III and IV allege retaliation under Title VII and the PHRA. Like discrimination claims, retaliation claims brought under Title VII and the PHRA are also controlled by the McDonnell Douglas burden shifting framework. See Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (applying the McDonnell Douglas framework to a Title VII retaliation claim).[29]

To establish a *prima facie* case of retaliation, a plaintiff must put forth evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006). To show a causal connection, the plaintiff may point to the temporal proximity of the protected activity and the adverse employment action, as well as any evidence of a pattern of antagonism. Tourtellotte v. Eli Lilly and Co., 636 F. App'x 831, 852 (3d Cir. 2016) (citing Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). The Third Circuit has called for an objective standard, in which "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or

---

[29]      As with Plaintiff's sex discrimination claim, it is proper to analyze her retaliation claims under Title VII and the PHRA under the same framework. See Connelly v. Lane Const. Corp., 809 F.3d 780, 791 n.9 (3d Cir. 2016).

supporting a charge of discrimination.'" <u>Moore</u>, 461 F.3d at 341 (quoting <u>Burlington N. & Sante Fe Ry. Co.</u>, 548 U.S. at 68).

The parties do not dispute that Plaintiff can show a *prima facie* case for retaliation. Rather, SEPTA argues that Plaintiff has not put forth sufficient evidence of pretext. Because the Court has already determined that Plaintiff has established sufficient facts to show pretext in support of her disparate treatment claim, the Court will decline to grant summary judgment for SEPTA on this basis. Summary judgment on Plaintiff's retaliation claim in therefore denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant SEPTA's Motion for Summary Judgment (ECF 16) is GRANTED IN PART and DENIED IN PART.

An appropriate Order follows.

O:\CIVIL 17\17-4475 Donaldson v SEPTA\17cv4475 Memo re Mot for SJ